*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON LEE FEDEWA,

        Defendant-Appellant.

UNPUBLISHED
April 18, 2024

No. 362396
Cass Circuit Court
LC No. 2021-010011-FC

Before: BOONSTRA, P.J., and FEENEY and YOUNG, JJ.

PER CURIAM.

A jury convicted Jason Lee Fedewa of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a); MCL 750.520b(2)(b) (sexual penetration between a victim less than 13 years of age and a defendant 17 years of age or older), and three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a); MCL 750.520c(2)(b) (sexual contact between a victim less than 13 years of age and a defendant 17 years of age or older), for the sexual abuse of his minor child, AF.[1] The trial court sentenced Fedewa to serve concurrent sentences of 25 to 50 years and 7 to 15 years in prison for each count of CSC-I and CSC-II, respectively.

Fedewa appeals his convictions and his sentence(s) for the CSC-I charges. He argues that the trial court erred by (1) qualifying the prosecution's expert and allowing the expert's testimony on child-sexual-abuse-accommodation-syndrome (CSAAS) factors, (2) allowing inadmissible hearsay evidence, (3) denying a psychological examination of the victim, and (4) imposing a 25-year mandatory minimum sentence for his CSC-I convictions. Fedewa also argues his trial counsel was ineffective. We disagree and affirm.

---

[1] In the trial court record and in the appellate briefing, AF is sometimes referred to as HF. We will use AF throughout this opinion.

## I. BACKGROUND

This case arises from AF's allegations of sexual abuse against Fedewa. AF testified that Fedewa sexually penetrated, molested, and touched AF multiple times between the time AF was 8 and 13 years old. Outside of this sexual abuse, AF alleged that Fedewa would get angry when AF stayed at friends' houses. According to AF, Fedewa said AF could not move out of the family home until AF's older brothers had children, and AF could not date until Fedewa was dead.

Multiple witnesses at trial testified that Fedewa made AF sleep in his bed and grew angry and emotional when AF did not want to sleep there anymore. Other family members attributed Fedewa's behavior to not wanting AF to grow up. Fedewa also kept an electronic journal, where he wrote that he cried when AF no longer wanted to sleep with him. He wrote that it "sucks" when AF had friends spend the night because he felt ignored.

AF first reported the abuse in October 2020 and Children's Protective Services (CPS) removed AF from Fedewa's home. AF was diagnosed with PTSD and received treatment in a psychiatric hospital due to significant suicidal ideations, attempted suicide, and ongoing self-harm. Before trial, Fedewa moved for AF to undergo Minnesota Multiphasic Personality Inventory (MMPI) testing after discovering the recommendation in a doctor's note. The note stated the MMPI should be administered if AF is to testify in court because there appeared to be "a strong deficit in [AF's] personality." The trial court denied the motion, stating there was no compelling reason to order a psychological evaluation, and AF's credibility could instead be addressed on cross-examination.

Two medical professionals, Dr. Stephen Guertin and Forensic Nurse Examiner Amanda Haueter, who examined and treated AF in 2020, testified at trial regarding statements AF made to them during treatment about the sexual abuse. Nurse Haueter also performed a partial Sexual Assault Nurse Examination (SANE) on AF one week after the last instance of sexual abuse occurred. Defense counsel objected to the prosecutor's questions about statements AF made during treatment by Dr. Guertin and Nurse Haueter, but the trial court allowed the testimony under the hearsay exception for medical diagnosis and treatment.

The parties stipulated at trial that Dr. James Henry be qualified as an expert on the impact of trauma, trauma assessment, child maltreatment, child development, and child sexual abuse. Dr. Henry explained behavioral patterns among children who have experienced sexual abuse. After trial, Fedewa was convicted by a jury and sentenced as noted above.

After filing the instant appeal, Fedewa moved in the trial court for a new trial and/or resentencing, arguing that the trial court erred by permitting Dr. Henry's testimony and in imposing Fedewa's sentence for CSC-I. Fedewa alternatively requested a *Ginther*[2] hearing concerning his trial counsel's ineffectiveness for not objecting to these errors. The trial court denied Fedewa's motion.

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## II.  EXPERT TESTIMONY

Fedewa argues that a new trial is warranted because the trial court erred by (1) qualifying Dr. Henry as an expert witness,[3] (2) allowing Dr. Henry to testify about the CSAAS factors, and (3) permitting Dr. Henry to selectively align the victim's situation with the CSAAS factors. Fedewa relatedly argues that his trial counsel was ineffective for not objecting to Dr. Henry's testimony.  We disagree.

### A.  STANDARDS OF REVIEW

To preserve an evidentiary issue for review, the party opposing the admission of the evidence must generally object at trial and specify the same ground for objection that they assert on appeal.  *People v Grant*, 445 Mich 535, 545, 553; 520 NW2d 123 (1994).  Fedewa did not request a *Daubert*[4] hearing or object to Dr. Henry's testimony at trial.  Fedewa did, however, raise these issues in a motion for a new trial, which we conclude renders them preserved for appellate review.  See *People v Christianson*, unpublished[5] opinion of the Court of Appeals, issued August 17, 2023, (Docket No. 359421), p 4 n 3 (the defendant preserved his claim of instructional error by raising the argument in a motion for a new trial, even after defense counsel twice expressed satisfaction with the jury instructions at trial).[6]

"The decision whether to admit evidence is within the trial court's discretion, which will be reversed only where there is an abuse of discretion."  *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).  "Similarly, the determination regarding the qualification of an expert and the admissibility of expert testimony is within the trial court's discretion."  *People v Murray*, 234 Mich

---

[3] Because the parties stipulated at trial that Dr. Henry be qualified as an expert, Fedewa waived this issue on appeal.  See *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error."); *People v Carines*, 460 Mich 750, 763 n 7; 597 NW2d 130 (1999) (Waiver is the "intentional relinquishment or abandonment of a known right.") (quotation marks and citation omitted).  We also note that Fedewa's motion for a new trial stated that "it is not [Dr. Henry's] qualifications that are at issue[,] but rather [his] testimony . . . ."

[4] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

[5] "While [unpublished] opinions are not binding precedent . . . , [this Court] may consider them as instructive or persuasive."  *People v Jamison*, 292 Mich App 440, 445; 807 NW2d 427 (2011).

[6] *Christianson* notes unpublished opinions of this Court wherein instructional arguments were deemed unpreserved under similar circumstances.  *Christianson*, unpub op at 4 n 3.  In those cases, the Court relied on *People v Mayfield*, 221 Mich App 656; 562 NW2d 272 (1997), where we wrote: "The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice."  *Mayfield*, 221 Mich App at 660.  Here, in his motion for a new trial, Fedewa made the same arguments in the trial court that he makes on appeal regarding Dr. Henry's expert testimony, and the trial court had an opportunity to hear and rule on those arguments.  Therefore, appellate counsel has done what they can in the trial court.  The issue is preserved.

App 46, 52; 593 NW2d 690 (1999) (citation omitted). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). "When the decision to admit evidence involves a preliminary question of law, such as whether an evidentiary rule precludes admission of the evidence, this issue of law is reviewed de novo." *People v Malone*, 287 Mich App 648, 661; 792 NW2d 7 (2010).

"Whether to grant a new trial is [also] in the trial court's discretion, and its decision will not be reversed absent an abuse of that discretion." *People v Brown*, 279 Mich App 116, 144; 755 NW2d 664 (2008). Underlying questions of law are reviewed de novo, and a trial court's factual findings are reviewed for clear error. *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010). A trial court's finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake was made. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008).

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). As here, "[w]hen no *Ginther* hearing has been conducted, our review of the defendant's claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Anderson*, 322 Mich App 622, 628; 912 NW2d 607 (2018).

## B. DISCUSSION

"The trial court has an obligation under MRE 702 to ensure that any expert testimony admitted at trial is reliable." *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007) (quotation marks and citation omitted). In *People v Beckley*, 434 Mich 691, 724; 456 NW2d 391 (1990), our Supreme Court opined that syndrome evidence like CSAAS

> has a very limited use and should be admitted cautiously because of the danger of permitting an inference that as a result of certain behavior sexual abuse in fact occurred, when evidence of the syndrome is not a conclusive finding of abuse. Although syndrome evidence may be appropriate as a tool for purposes of treatment, . . . it is unreliable as an indicator of sexual abuse.

In *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995),[7] the Court clarified the parameters of CSAAS testimony, and expanded on its use as follows:

---

[7] In 2020, our Supreme Court denied leave to appeal a judgment of the Court of Appeals dealing with factual and legal issues like those in *Peterson*. See *People v Mejia*, 505 Mich 963; 937 NW2d 121 (2020). In her dissent, Chief Justice McCormack said leave to appeal should have been granted to further review the defendant's argument for reconsideration of the admissibility of CSAAS under *Daubert* and *Peterson*. *Id*. at 963-964 (MCCORMACK, C.J., dissenting). Although Chief Justice McCormack (1) noted that "recently courts around the country . . . have been

[W]e reaffirm our holding in *Beckley* that (1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty. However, we clarify our decision in *Beckley* and now hold that (1) an expert may testify in the prosecution's case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility. [*Id*. at 352-535.]

Accordingly, "Michigan courts regularly admit expert testimony concerning typical and relevant symptoms of abuse, such as delayed reporting and secrecy." *People v Muniz*, 343 Mich App 437, 443; 997 NW2d 325 (2022). *Muniz* explained there is a broad range of physical, psychological, and emotional symptoms that child abuse victims can exhibit. The purpose of allowing expert testimony in child-sexual abuse cases is "to give the jury a framework of possible alternatives for the behaviors and to provide sufficient background information about each individual behavior at issue which will help the jury to dispel any popular misconception commonly associated with the demonstrated reaction." *Id*. at 443-444. The *Muniz* Court also recognized that a victim's behavior can often be irrational and confusing to most people, and "expert testimony is admissible and appropriate to explain that behavior with no need to engage in an analysis of scientific reliability." *Id*. at 445 (quotation marks and citations omitted; alteration in original).

Put simply, "[a]n expert may testify regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim *or* to rebut an attack on the victim's credibility." *Peterson*, 450 Mich at 373. However, "examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury." *Thorpe*, 504 Mich at 235.

Here, Dr. Henry testified that (1) delayed reporting is common for children who have experienced sexual abuse, and (2) victims of child sexual abuse may respond with disassociation, shame, depression, anxiety, posttraumatic stress disorder, and hyperarousal. Dr. Henry testified, at least in part, "regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim *or* to rebut an attack on the victim's credibility." *Peterson*, 450 Mich at 373.

---

grappling with troubling questions about the validity and reliability of such evidence" and (2) wanted the Court "to join that conversation," *id*., we remain bound by *Peterson*.

However, while testifying about general characteristics of child complainants, Dr. Henry identified traits that directly paralleled AF's own experiences. For example, Dr. Henry testified about a general characteristic of self-harm among complainants who have a parent who does not believe them. When the nonoffending parent does not believe the complainant, "you're gonna see an increase in self-harm; you're gonna see an increase in dissociation; you're gonna see an increase in this suicidal ideations [sic] . . . ." In his explanation about the support, or lack thereof, of the nonoffending parent, Dr. Henry exclusively referred to "mom" as the nonoffending, and non-believing parent. Dr. Henry also testified that children complainants are "often" diagnosed with post-traumatic stress disorder. Finally, while disclaiming that the research was in its "beginning" stages, Dr. Henry testified "gender identity" issues can be part of the "shame" response to assault. Dr. Henry said that "identifying and moving in that direction is another way of self-protection and another way to reduce my shame, in terms of if I'm a boy, this won't happen to me and then I can be in that sense of I'm not her anymore, I'm him."

Immediately after addressing these "general" traits, Dr. Henry testified about his specific observations of AF. Dr. Henry told the jury that at the time of his assessment, AF was in a psychiatric hospital "due to significant suicidal ideations and [a] suicide attempt, as well as ongoing self-harm." This he attributed specifically to AF's non-believing mother:

> We did an interview with [AF], did some testing, and diagnosed [AF] with PTSD. [AF] communicated at length about [AF's] dissociation, in terms of feeling like things aren't real, about [AF's] self-harm, in terms of the reason why self-harm is to feel because I can't feel my body. [AF] talked about that on-going experience of not feeling loved and cared for, especially given the disbelief by [AF's] mother.

At the time the jurors heard this, AF had already testified about being non-binary and pansexual. AF had already requested not to be referred to by AF's feminine birth name or she/her pronouns. In sum, the jury heard from Dr. Henry that child complainants self-harm when they have a non-believing mom and learned from Dr. Henry that AF had a non-believing mom and was self-harming. The jury heard from Dr. Henry that child complainants can undergo a transition from boy to girl as a means of self-protection, and the jury learned from AF and other witnesses that AF was born female and transitioned.

Even though Dr. Henry did not *specifically* vouch for AF's credibility as the expert in *Thorpe* did, 504 Mich at 259, his testimony significantly aligned with AF's specific experiences and testimony. We caution against "general" characteristic testimony that is tailored to the complainant's disclosure "with the precision of a form-fitting Italian leather glove."[8] We also note that, here, Dr. Henry did not refer to CSAAS or testify explicitly that AF's behavior was consistent with that of a sexually abused child. Most importantly, on cross-examination, Dr. Henry testified that AF's diagnoses and related behaviors could have been caused by another source of trauma. "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Thorpe*,

---

[8] Metaphor courtesy of Fedewa's appellate counsel.

504 Mich at 253. Accordingly, the trial court did not abuse its discretion by allowing Dr. Henry's testimony.

Given how close a question this proves to be, we further note that, if the trial court did abuse its discretion in allowing Dr. Henry's testimony, then it is not "more probable than not" that Dr. Henry's testimony resulted in a miscarriage of justice. *People v Lukity*, 460 Mich 484, 495; 496 NW 2d 607 (1999). The evidence presented against Fedewa included testimony from AF, testimony regarding AF's disclosure from two medical experts (not including Dr. Henry), excerpts from Fedewa's own e-journal, and testimony from AF's brother regarding the abnormal relationship AF had with Fedewa. This case cannot be said to be "largely [a] credibility contest." *People v Thorpe*, 504 Mich 230, 264; 934 NW2d 693 (2019).

For these reasons, we also reject Fedewa's argument that his trial counsel was ineffective for not objecting to Dr. Henry's testimony.

> To establish that his or her lawyer provided ineffective assistance, a defendant must show that (1) the lawyer's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for the lawyer's deficient performance, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In addition, [e]ffective assistance of counsel is presumed, and a defendant bears a heavy burden of proving otherwise. The [d]efendant also bears the burden of establishing the factual predicate for his [or her] claim. [*Anderson*, 322 Mich App at 628 (quotation marks and citations omitted; first and second alterations in original).]

As we have noted, the facts of this case present a close question regarding whether Dr. Henry's testimony about gender identity and self-harm is admissible. Despite this, Fedewa cannot show he was prejudiced for the reasons we have articulated. Moreover, because Fedewa's challenge to the admission of Dr. Henry's testimony fails, Fedewa's related ineffective-assistance claim also fails. See *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998) ("Trial counsel cannot be faulted for failing to raise an objection or motion that would have been futile."). Because Dr. Henry's testimony was admissible and Fedewa's counsel was not ineffective for failing to object to it, the trial court did not abuse its discretion in denying Fedewa's motion for a new trial, at least with respect to these issues.

## III. CHALLENGED HEARSAY EVIDENCE

Fedewa further argues that a new trial is warranted because the trial court erred by allowing inadmissible evidence under the hearsay exception for diagnosis and treatment of medical conditions. We disagree.

As stated, we review the decision whether to admit evidence for an abuse of discretion, *Gursky*, 486 Mich at 606, which occurs "when [the] decision falls outside the range of principled outcomes." *Feezel*, 486 Mich at 192. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." MRE 801(c).[9]  Hearsay is not admissible unless the Michigan Rules of Evidence provide otherwise.  MRE 802.

MRE 803(4) provides that the following statements are not excluded by the hearsay rule, regardless of whether the declarant is available as a witness:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

"The rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Duenaz*, 306 Mich App 85, 95; 854 NW2d 531 (2014) (quotation marks and citation omitted).

In cases of suspected child abuse, the child's statements may be admitted under MRE 803(4) "when the totality of circumstances surrounding the statements supports that they are trustworthy." *Id.*  When the child victim is over the age of 10, there is a rebuttable presumption that the child understands the need to tell the truth to medical professionals—and the absence of any "immediately apparent physical injuries" does not rebut this presumption. *People v Garland*, 286 Mich App 1, 9; 777 NW2d 732 (2009).  Further,

> [p]articularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment. [*People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011).]

Here, Fedewa appears to argue that although AF was 13 years old at the time of the medical examinations at issue, the *Meeboer* factors[10] must still be analyzed "to determine whether a child

---

[9] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024.  See ADM File No. 2021-10, 512 Mich lxiii (2023).  This opinion relies on the version of the rules in effect at the time of trial.

[10] In *People v Meeboer*, 439 Mich 310, 324-325; 484 NW2d 621 (1992) (citations omitted), the Michigan Supreme Court stated as follows:

> Factors related to trustworthiness guarantees surrounding the actual making of the statement include: (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology

of tender years understood the need to tell the truth." However, in *People v Van Tassel*, 197 Mich App 653; 496 NW2d 388 (1992), this Court concluded that if "the complainant is over the age of ten and is therefore not of 'tender years[,]' . . . the *Meeboer* factors have no application and . . . a rebuttable presumption arises that a minor who is over the age of ten understands the need to tell the truth to medical personnel." *Id*. at 662. Therefore, there is a rebuttable presumption that AF understood the need to tell the truth to Dr. Guertin and Nurse Haueter when speaking in connection with the victim's medical diagnosis and treatment. Nevertheless, pursuant to MRE 803(4), we analyze whether AF's statements (1) were reasonably necessary to receive medical treatment or diagnosis; and (2) described the victim's medical history, past or present symptoms or sensations, their inception, or their general cause.

Fedewa takes issue with Nurse Haueter's testimony regarding AF's statements made during the SANE examination. These statements include the victim's disclosures that (1) Fedewa raped AF via penile-vaginal penetration in 2018; (2) Fedewa's sexual abuse happened as recently as one week before the SANE examination; and (3) Fedewa said AF was no longer a virgin and that he loved AF more than a daughter. Fedewa also takes issue with Dr. Guertin's testimony regarding AF's statements made during AF's physical examination. These statements include AF's disclosures that (1) Fedewa sexually molested AF between the ages of 8 and 13; (2) before AF's menses, Fedewa touched and put his mouth on AF's breasts and "private area"—and touched AF's buttocks; (3) after AF's menses, Fedewa touched and put his mouth on AF's breasts and vulvar area—and inserted his finger into AF's vagina—on three occasions, and Fedewa inserted his penis into AF's vagina once; and (4) regardless of menses, AF had to touch, including by mouth, Fedewa's penis multiple times.

Thus, AF's statements (1) described the general inception, cause, and course of Fedewa's sexual abuse against AF, and (2) involved the physical and psychological harm inflicted by Fedewa over the course of five years. Because AF's examinations were conducted in response to allegations of sexual assault—"in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature"—AF's "complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Mahone*, 294 Mich App at 215. Further, because of these disclosures, AF was tested for sexually transmitted diseases and referred to counseling services. Fedewa argues that "[g]iven [AF's] lack of any current pain or symptoms, [AF] simply had no obvious motivation to tell the truth to receive treatment." However, the absence of any "immediately apparent physical injuries" does not rebut the presumption that a child victim over the age of 10 understands the need

---

unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate.

to tell the truth to medical professionals. *Garland*, 286 Mich App at 9. Therefore, AF's statements were reasonably necessary for Nurse Haueter and Dr. Guertin to properly assess, diagnose, and treat AF, both physically and psychologically.

Fedewa also argues that AF's statements were made "exclusively as part of a police investigation" to build a case against Fedewa. In *People v Johnson*, 315 Mich App 163, 195; 889 NW2d 513 (2016), this Court concluded that a physical examination held less than one month after the victim's disclosure and more than four months before trial, tended "to show that the exam was not for litigation purposes." Here, AF's last reported instance of sexual abuse occurred approximately one week before AF's examination with Nurse Haueter and a few weeks before AF's examination with Dr. Guertin. And both examinations took place approximately a year and a half before trial. This short time gap between AF's disclosure and physical examinations tends to show, even more so than in *Johnson*, that the examinations were not conducted for litigation purposes.

Therefore, Nurse Haueter's and Dr. Guertin's testimonies were properly admitted under the hearsay exception for diagnosis and treatment of medical conditions, and Fedewa is not entitled to a new trial on this issue.

## IV. PSYCHOLOGICAL EXAMINATION

Fedewa also argues that the trial court erred by not allowing a psychological examination of the victim, and he requests that this Court remand this matter with orders to allow his requested testing. We disagree that the trial court erred and decline to remand.

The trial court has discretion to order discovery in a criminal case. *People v Shahideh*, 277 Mich App 111, 113; 743 NW2d 233 (2007), rev'd on other grounds 482 Mich 1156 (2008), citing *People v Freeman*, 406 Mich 514, 516; 280 NW2d 446 (1979).[11] A trial court's decision regarding discovery requests—including whether to compel "the complaining witness to submit to a psychiatric examination"—is reviewed for an abuse of discretion. *Id*.

The trial court should grant discovery requests when "the information sought is necessary to a fair trial and a proper preparation of a defense." *People v Laws*, 218 Mich App 447, 452; 554 NW2d 586 (1996), citing *People v Graham*, 173 Mich App 473, 477; 434 NW2d 165 (1988). "[I]t should not be granted where to do so would be to sanction a fishing expedition." *Graham*, 173 Mich App at 477. Further, when deciding whether to grant or deny "pretrial discovery in a criminal case, the trial court should consider whether the defendant's rights can be fully protected by cross-

---

[11] Although this Court is not required to follow cases decided before November 1, 1990, see MCR 7.215(J)(1), a published case decided by this Court "has precedential effect under the rule of stare decisis," MCR 7.215(C)(2). See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (stating that although this Court is not "strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990," those opinions are nonetheless "considered to be precedent and entitled to significantly greater deference than are unpublished cases."). The rulings in *Freeman* and *People v Graham*, 173 Mich App 473, 477; 434 NW2d 165 (1988), have also been applied in post-1990, binding authority.

examination." *Id*. Notably, "[a] psychological examination of a complaining witness in a criminal sexual conduct case may be ordered in certain cases, but there must a compelling reason to do so." *Id*. at 478.

In this case, 11 days before trial, Fedewa requested that AF undergo MMPI testing. Fedewa explained that he had recently discovered a doctor's note—written approximately 11 months before trial—which stated, in pertinent part, as follows:

> Would highly recommend MMPI be administered to this child, especially if [AF's] testimony is to be used in court. There appears to be a strong deficit in [AF's] personality and it would be good for the courts to arrange for a full battery of psychological and neuropsychological tests before any testimony is heard.

Fedewa argued that he "should be able to explore if the main prosecution witness suffers from a personality issue that calls into question [the witness's] testimony, especially after a medical doctor has made this exact recommendation." At oral argument, his counsel emphasized that the purpose of pursuing MMPI testing was to assess the victim's credibility to testify at trial. The prosecutor responded, arguing that the testing was not necessary or appropriate, and Fedewa should not be allowed to delay the trial for a "fishing expedition."[12] Ultimately, the trial court denied Fedewa's motion.

We find *Freeman* and *Graham* instructive in this case. In *Freeman*, 406 Mich at 515, the trial court granted the defendant's motion to order the complaining witness to undergo a psychiatric examination. Our Supreme Court found the trial court's grant of this order was an abuse of discretion where the defendant's counsel did not substantiate claims that (1) he was entitled to have his motion granted because the complaining witness was a "highly nervous person;" (2) the alleged CSC-I crimes occurred more than two years before the date of the hearing; (3) the complaining witness was mentally impaired; (4) the accusation was uncorroborated; and (5) the information was necessary to attack the complaining witness' credibility. *Id*. at 516. The *Freeman* Court said the defendant "must more adequately demonstrate the need for the discovery he seeks. We will not speculate as to what factors would warrant providing that relief," and "something more than the amorphous contentions advanced in [the] record must be supplied." *Id*.

In *Graham*, the defendant was accused of sexually assaulting his girlfriend's first child from a different relationship. The trial court in *Graham*, 173 Mich App at 475, similarly granted the defendant's motion to require his girlfriend to submit to an independent psychological

---

[12] The prosecution also argued that (1) Fedewa's motion was untimely; (2) the recommendation for the victim to undergo MMPI testing "was arguably the product of strong advocacy by [the victim's mother] to [the doctor] despite [the doctor] acknowledging that most clinicians do not recommend administering an MMPI to children as it is not recommended to attempt to diagnose a personality disorder in a person under 18 years of age"; (3) efforts were made to administer a MMPI test; however, the victim's placement in a psychiatric hospital precluded such testing; (4) the victim already completed a Child Trauma Assessment Center evaluation; and (5) two other doctors did not recommend MMPI testing.

evaluation. The defendant argued that (1) the girlfriend's alcoholism might have had a direct bearing on the allegations of sexual assault against the defendant; (2) the girlfriend made prior allegations of sexual abuse and rape to the police that were ultimately dismissed; (3) the girlfriend allegedly cohabitated with other men who shared the defendant's first name; and (4) the girlfriend continued to bring unfounded and unsubstantiated charges regarding the defendant's treatment and care of their child-in-common because they were involved in a probate court proceeding for a dispute over custody of the child. *Id*. at 476-477. At the hearing on the defendant's motion, the defendant's counsel stated that the purpose of the examination was to (1) assess the girlfriend's characteristics for being a truthful or untruthful person and (2) see whether the girlfriend is the type to influence her child to lie about charges of sexual assault. *Id*. at 477.

This Court held in *Graham* that the defendant failed to show compelling reasons for a discovery order requiring such testing because the defendant's motion was based on unsupported arguments, and no evidence was introduced to support the defendant's assertions. This Court further opined that the defendant's concerns regarding the motive the girlfriend might have for encouraging her child to lie could be properly addressed during cross-examination. *Id*. at 478. Importantly, this Court also found that a psychological evaluation might "very well invade the province of the trier of fact in this case. It is well established that an expert may not render an opinion or assessment as to the veracity of a complaining witness in a criminal sexual conduct case." *Id*.

Here, the trial court properly considered *Freeman* and *Graham* before determining that there was no compelling reason to order a psychological examination, and Fedewa's right to a fair trial could be adequately protected through cross-examination of AF. Fedewa acknowledged that he did not know what the MMPI test would uncover—he simply argued in his motion that he "should be able to explore if the main prosecution witness suffers from a personality issue that calls into question [the witness's] testimony . . . ." This Court in *Graham* found such a purpose was not compelling enough to order psychological testing. *Graham*, 173 Mich App at 478. The trial court cannot be faulted for failing to find a compelling reason to order such testing where Fedewa could not bring forth a compelling reason himself. And although the recommendation for an MMPI contained in a doctor's note is more compelling than the defendants' allegations and concerns in *Graham* and *Freeman*, granting Fedewa's discovery request would have also sanctioned an impermissible fishing expedition absent any statement from Fedewa that MMPI testing was linked to determining an examinee's credibility. *Id*. at 477.

Further, during AF's cross-examination, defense counsel questioned whether AF's medications affected AF's memory. Defense counsel also presented AF with inconsistencies between AF's trial testimony and AF's previous testimony, AF's family member's testimonies, and the medical professionals' testimonies. As this Court and our Supreme Court decided in *Freeman* and *Graham*, these opportunities at trial to attack the victim's credibility adequately protected Fedewa's right to a fair trial. Therefore, the trial court did not abuse its discretion by denying Fedewa's motion for a psychological examination of the victim.

## V. MINIMUM SENTENCING GUIDELINES

Lastly, Fedewa argues that the trial court erred by imposing a mandatory minimum—instead of mandatory maximum—sentence of 25 years regarding his convictions of CSC-I. He

relatedly argues that his trial counsel was ineffective for not objecting to the mandatory minimum sentencing range. We disagree.

Issues that involve "the proper interpretation and application of the legislative sentencing guidelines . . . are legal questions that this Court reviews de novo." *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004). As stated regarding claims of ineffective assistance, we review findings of fact for clear error and questions of constitutional law de novo. *Trakhtenberg*, 493 Mich at 47. And because no *Ginther* hearing was conducted, our review of the instant ineffective-assistance claim is limited to mistakes apparent on the record. See *Anderson*, 322 Mich App at 628.

MCL 750.520b(2)(b) states that a CSC-I conviction for a violation that is committed by an individual 17 years of age or older, against an individual less than 13 years of age, is punishable "by imprisonment for life or any term of years, but not less than 25 years." Additionally, MCL 769.34(2)(a) states, in pertinent part, as follows: "If a statute mandates a minimum sentence for an individual sentenced to the jurisdiction of the department of corrections, the court shall impose a sentence in accordance with that statute."

In *People v Roy*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 359894), this Court interpreted MCL 750.520b(2)(b) as follows:

> The plain and unambiguous language of the statute, the precedent of our Supreme Court and this Court and the legislative analysis of this statute clearly result in the conclusion that MCL 750.520b(2)(b) requires the imposition of a mandatory 25-year minimum sentence upon convicted CSC-I offenders who were 17 years old or older who committed CSC-I offenses against victims under the age of 13. We therefore hold, pursuant to MCL 750.520b(2)(b), a person 17 years old or older who is convicted of a CSC-I offense against a victim or victims under the age of 13 who receives a term-of-years sentence must be sentenced to a term of not less than a 25-year minimum sentence. [*Id*. at ___; slip op at 7.]

In this case, because Fedewa makes the same exact argument rejected in *Roy*, it is without merit. And because Fedewa was properly sentenced, his trial counsel was not ineffective for failing to object to Fedewa's minimum sentence. See *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984) ("[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Affirmed.

/s/ Mark T. Boonstra
/s/ Kathleen A. Feeney
/s/ Adrienne N. Young

-13-